UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
:
:
UNITED STATES OF AMERICA :
:
       v. :
: **MEMORANDUM & ORDER**
GERARD SNIPE, :
: 06 Cr. 1102 (LBS)
               Defendant. :
:
:
------------------------------------------------------------------x

SAND, J.

      Defendant Gerard Snipe was indicted for possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). He moved to suppress two statements that he allegedly made to the police after his arrest, claiming they were obtained in violation of the Fifth Amendment and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The Court conducted a suppression hearing on April 9, 2007 and April 26, 2007 where the two arresting officer and two officers from the Gun Enhancement Unit (GEU) testified. The defendant did not testify at the hearing.

Testimony at the Suppression Hearing

      Snipe was arrested on September 24, 2006 near Jessup Avenue in the Bronx for possession of a firearm, which the police recovered the same day. The arresting officers, Lieutenant Richard Gibson and Officer Felix Gross, handcuffed Snipe, placed him in the back of their police car and drove him first to his apartment to drop off keys and pick up an asthma pump

1

and then to the stationhouse.  The officers did not give Snipe Miranda warnings at any time during the car ride.  Both officers testified that, shortly after they placed him in the car, Snipe asked them if they could get rid of the bullets in the gun.  (Tr. 52, 79.)  According to the officers, this initial statement was not in response to any question posed by either of them.  (Tr. 52.)  Through his lawyer, Snipe denies making any such statement.  (Tr. 6.)

Officer Gross testified that after Snipe made the initial statement about the bullets, he started a conversation with Snipe and asked him several questions about where he got the gun and why he had it.  (Tr. 52.)  In response to these questions, Snipe told him that "he had problems, he had a beef with someone in the neighborhood, so he was carrying it for his protection."  (Tr. 52.)

Lieutenant Gibson testified that when they drove to Snipe's apartment, Officer Gross went inside to drop off Snipe's property leaving Gibson and Snipe in the car alone.  (Tr. 79.)  While Officer Gross was inside, Lieutenant Gibson testified, Snipe again mentioned getting rid of the bullets.  (Tr. 82.)  Gibson then asked Snipe a series of questions about where he got the gun and his criminal history.  (Tr. 79.)  In response, Snipe told him that the streets were bad and that he went to Pennsylvania to get away from some people in his neighborhood.  (Tr. 79, 86.)  While he was there, he got the gun for protection.  (Tr. 79, 86.)

After Officer Gross returned to the car, the police drove Snipe to the 48th Precinct.  Officer Gross testified that at 11:35 p.m. he interviewed Snipe in the muster room at the precinct.  (Tr. 55.)  He testified that he read Snipe Miranda warnings from a pre-printed form and that Snipe indicated that he understood each warning by writing "yes" on the form.  (Tr. 55; Gov't Ex. 2.)  Next to the last question, "Now that I have advised you of your rights, are you willing to answer questions?" Gross testified that Snipe wrote "No" and declined to make a statement.  (Tr.

55; Gov't Ex. 2.)  Gross also testified that Snipe wrote his initials at the bottom of the form.  (Tr. 56; Gov't Ex. 2.)  When Snipe indicated that he did not want to make a statement, Gross took him back to his cell and did not again attempt to obtain a statement from him.  (Tr. 56.)  Gross testified that Snipe never requested a lawyer.  (Tr. 56.)

Later in the evening, Officers Tim Garcia and Frank Vetell of the NYPD's Gun Enhancement Unit arrived at the 48th Precinct.  According to Officer Garcia, the basic job of officers with the GEU is to "go out and interview everyone in the city who is arrested with a firearm in an attempt to gain information on where these firearms are coming from."  (Tr. 9.)  Both arresting officers testified that they spoke with Officers Garcia and Vettel together, (Tr. 72-73, 90), but both GEU officers testified that Garcia spoke with the arresting officers alone while Vettel talked with other officers who were not involved with the case.  (Tr. 12, 33.)

The arresting officers both testified that they told the GEU officers about the statements that Snipe made in the car—both that he asked if they could "lose" the bullets and that he told them that he got the gun for protection, that he had problems with people in the neighborhood, and that he had gone to Pennsylvania to get away from these people.  (Tr. 73-74, 90-91.)  Neither Officer Gross nor Lieutenant Gibson could recall whether they told the GEU officers that Snipe had invoked his right to silence after receiving <u>Miranda</u> warnings.  (Tr. 57, 91.)  Officer Garcia provided a contradictory account.  He testified that the arresting officers only told him about one statement that Snipe made—that he asked them to remove the bullets.  (Tr. 13.)  Garcia specifically denied that the arresting officers told him about any other statements by Snipe about needing the gun for protection, his conflict with people from the next block, or going to Pennsylvania.  (Tr. 19-20.)  Garcia also testified that the arresting officers did not tell him that

Snipe had received Miranda warnings or that he had refused to make a statement earlier that evening. (Tr. 95.)

After speaking with the arresting officers, at about 12:50 a.m., Garcia and Vettel went to the holding cell and took Snipe to a different room. (Tr. 13.) Garcia took the lead in the interrogation and read Snipe Miranda warnings from a form. (Tr. 13-14.) Garcia testified that as he read Snipe each of the warnings, he asked Snipe if he understood. (Tr. 15.) When Snipe answered "yes," Garcia wrote "yes" on the form. (Tr. 15.) Garcia testified that Snipe then wrote his initials "GS" next to each "yes" and signed the bottom of the form indicating his willingness to answer questions after having been advised of his rights. (Tr. 15; see also Gov't Ex. 1.) Officer Vettel corroborated this account, testifying that he witnessed Snipe write his initials on the form and sign it. (Tr. 34, 39.) Both GEU officers testified that after signing the form waiving his Miranda rights, Snipe made a statement that he was having trouble with some people from the next block, that he moved to Allentown, Pennsylvania to get away from those people, that he bought the gun in Allentown from a crackhead for $50, and that when he came back into town to see his girlfriend he brought the gun for protection. (Tr. 15-16, 34-35.) Garcia testified that when he asked Snipe "if he knew anyone who had other guns," Snipe became annoyed and said "I don't want to talk to you anymore." (Tr. 16.) At that point, Garcia testified, the officers terminated the interview and placed Snipe back in the holding cell. (Tr. 16.)

Through his lawyer and by affirmation, Snipe maintains that he did not make any statements to the police at the precinct after receiving Miranda warnings. (Def.'s Mem. in Support at 10; Snipe Aff. ¶¶ 3-4.) He maintains that the only statements he made were in the car. (Def.'s Mem. in Support at 10; Snipe Aff. ¶¶ 3-4.)

4

The Bullet Statement

Snipe argues that the Court should suppress the arresting officers' testimony that Snipe asked them to get rid of the bullets. Snipe does not argue that the statement was coerced or that he made it in a custodial setting in response to police interrogation; rather he argues that he did not make the statement at all. When a defendant volunteers a statement before being subjected to any custodial interrogation, that statement is admissible. Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment."); see also Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). Both arresting officers testified consistently that Snipe's request that they get rid of the bullets was spontaneous and not in response to any questions posed by them. The defendant offers no evidence to the contrary, he merely represents through counsel that the statement was not made. The Court finds the arresting officers' testimony that Snipe made the bullet statement spontaneously to be credible. Accordingly, because the statement was not made in response to custodial interrogation, it was not obtained in violation of Miranda and will not be suppressed.

The Protection Statements

The parties do not dispute that the Snipe's other statements in the police car—that he got the gun in Pennsylvania for protection because he had a problem with some people in the neighborhood (the "protection statements")—were the product of custodial interrogation. Nor do the parties dispute that arresting officers did not advise Snipe of his rights under Miranda before questioning him, even though they knew he was in custody. Accordingly it is clear that these statements made in the car were obtained in violation of Miranda and must be suppressed. The government, however, argues that the substance of the protection statements should be

admissible because the GEU officers testified that Snipe repeated the statements to them after being warned of and waiving his Miranda rights.  The defendant argues, first, that Snipe did not make the protection statements to the GEU officers and, second, that even if he had, they must be suppressed because the GEU officers reinitiated interrogation after Snipe invoked his right to silence in an earlier interview with Officer Gross.

Law enforcement officers may not interrogate a suspect who has been taken into custody without first advising that person of his right to remain silent and his right to legal counsel. Miranda, 384 U.S. at 479.  Statements made in response to custodial interrogation without the benefit of Miranda warnings cannot be used as affirmative evidence in the government's case-in-chief.  Michigan v. Harvey, 494 U.S. 344, 350 (1990).  To introduce an incriminating statement made in response to custodial interrogation in its case-in-chief, the government bears the burden of proving by a preponderance of the evidence that the accused waived his Miranda rights voluntarily, knowingly, and intelligently.  Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda, 384 U.S. at 475.

Once a suspect invokes his right to remain silent, the interrogation must cease and any statement taken thereafter "cannot be other than the product of compulsion, subtle or otherwise." Miranda, 384 U.S. at 473-74.  This is not, however, a per se prohibition on all further interrogation.  Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989).  As the Supreme Court explained in Michigan v. Mosely:

> To permit the continuation of custodial interrogation after only a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned.  At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.

423 U.S. 96, 102 (1975). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether [the defendant's] 'right to cut off questioning' was 'scrupulously honored.'" Id. at 104 (quoting Miranda, 384 U.S. at 474, 479). The Court in Mosely held that the police did not violate a suspect's rights by reinitiating interrogation after he had invoked his right to silence where the subsequent interrogation was conducted by a different officer more than two hours later and the police issued a fresh set of Miranda warnings and limited the subject matter of the questions to a crime that had not been discussed in the first interrogation. Id. at 104-05.

Defendant attempts to distinguish Mosely because in the second interrogation the GEU officers asked questions about the same subject matter that Snipe refused to discuss in the first interrogation—his possession of the gun. While the parties point to no controlling Second Circuit authority on the issue, courts in other circuits have found that the mere fact that a subsequent interrogation is on the same subject matter does not render it unconstitutional. See, e.g., United States v. Wyatt, 179 F.3d 532, 538 (7th Cir. 1999) ("[T]he constitutionality of a subsequent police interview depends not on its subject matter, but rather on whether the police…sought to undermine the suspect's resolve to remain silent."); Weeks v. Angelone, 176 F.3d 249, 267-69 (4th Cir. 1999) ("[T]he mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation constitutionally invalid under Mosely.").

The Court, however, need not reach the issue of whether the police in this case "scrupulously honored" Snipe's right to remain silent when they reinitiated questioning on the same subject matter because it finds that the government has not sustained its burden of showing that Snipe made the protection statements after a valid waiver of his Miranda rights. The only

7

evidence the government has presented that Snipe made the protection statements after being advised of and waiving his Miranda rights is the testimony of Officers Garcia and Vettel—Snipe did not make a written statement and there is no recording of the interrogation—yet their testimony, taken as a whole, lacks reliability.

Both Garcia and Vettel denied that they had learned anything about why Snipe had the gun before they interrogated him.  Garcia testified that the arresting officers did not tell him that Snipe had made the protection statements in the car.  (Tr. 19-20.)  He said that they only told him about the bullet statement.  (Tr. 13, 19-20.)  Vettel testified that he did not even speak to the arresting officers.  (Tr. 33.)  The arresting officers flatly contradicted this testimony.  Both Officer Gross and Lieutenant Gibson specifically and consistently testified that they told the GEU officers that Snipe made the protection statements in the car.  (Tr. 73-74, 90-91.)  The arresting officers' account of the meeting is inherently more plausible.  It is unclear why the arresting officers would have told the GEU officers about the bullet statement, but neglected to mention why Snipe had the gun and where he got it, especially in light of the fact that the whole purpose of the GEU officers' participation in the investigation was, as Garcia put it, "to gain information on where guns are coming from."  (Tr. 10.)  Both arresting officers agreed that it was important to give details to the GEU officers so that their interview could be as effective as possible.  (Tr. 73, 90-91.)

Additionally, the GEU officers insisted that Snipe wrote his initials "GS" on the Miranda form next to each "yes" that Officer Garcia wrote.  (Tr. 15, 34, 39; see also Gov't Ex 1.)  Yet the handwritten "GS" on that form looks nothing like the "GS" that Snipe wrote on the Miranda form that Officer Gross had him initial and nothing like his signature.  (Compare Gov't Ex. 1 with Gov't Ex. 2.)  On the GEU officers' form, the initials "GS" are neatly printed in capital

8

letters.  (See Gov't Ex. 1.)  On Officer Gross's form, the initials are in a sloppy cursive similar to the "G" and the "S" in Snipe's signature on both the GEU officers' form and his affirmation in support of the motion to suppress.  (See Gov't Ex. 2; Snipe Aff.)  At the time the GEU officers testified that Snipe himself wrote the "GS" on their form, the prosecution was not yet aware of the existence of Officer Gross's form and its dissimilar sample of Snipe's initials.[1]  Officer Garcia repeated his testimony that Snipe was the one who wrote the initials on his form after being confronted with both forms on reexamination.  (Tr. 97.)  But the Court finds the reliability of the GEU officers' testimony about how carefully they advised Snipe of his rights to be undermined.  Although, in the absence of expert testimony, the Court cannot definitively determine the accuracy of the officers' testimony, it is a further factor supporting the conclusion that the government has not met its burden here.[2]

On the whole, the Court cannot say that the government has proven by a preponderance of the evidence that Snipe made the protection statements—the substance of which the police had already obtained in clear violation of Miranda—to the GEU officers after receiving and validly waiving his Miranda rights.  Accordingly, the protection statements must be suppressed.

Conclusion

For the reasons stated above, defendant's motion to suppress is granted in part and denied in part.  The motion is denied as to Snipe's statement in the police car asking the police to get rid of the bullets.  The motion is granted as to the protection statements, made in the police car

---

[1] The government has represented to the Court that it was not aware of the existence of the Miranda form used by Officer Gross (Gov't Ex. 2) until it received a hardcopy of the Bronx district attorney's file several days after Officers Garcia and Vettel testified on April 9, 2007.

[2] This conclusion is not based on a finding that the officers deliberately misstated their recollection of the events which took place seven months prior to their testimony, the significance of which may not have been apparent at the time.

without <u>Miranda</u> warnings and allegedly repeated to officers Garcia and Vettel. The parties are directed to contact Chambers within 48 hours to schedule a status conference.

**SO ORDERED.**

Dated:  June 11, 2007
        New York, NY

_____
                U.S.D.J.